No. 81,804

STATE OF KANSAS, *Appellee*, v. WILLIAM DANIEL PLASKETT,
*Appellant*.

(27 P.3d 890)

Opinion filed
July 27, 2001.

*Reid T. Nelson*, assistant appellate defender, and *Thomas A. Pavlinic*, of Annapolis, Maryland, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with them on the briefs for appellant.

*Steven J. Obermeier* and *Donald W. Hymer*, assistant district attorneys, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with them on the brief for appellee.

*Douglas R. Richmond*, of Armstrong Teasdale LLP, Kansas City, Missouri, was on the brief for *amicus curiae* False Memory Syndrome Foundation.

The opinion of the court was delivered by

ALLEGRUCCI, J.: William Daniel Plaskett appeals his jury convictions and sentences on three counts of aggravated incest. Plaskett was sentenced to 5-10 years on Count I, 5-10 years on Count II, and 4-10 years on Count III. The sentences run consecutively for a controlling sentence of 14-30 years.

The complaint filed against Plaskett shows that he was charged with violating K. S. A. 21-3603 (Ensley 1988) by the lewd fondling of his adopted daughter, A.W., during the period between January 1, 1991, and September 1, 1991, when A.W. was under the age of 18 years. He also was charged with lewd fondling of his stepdaughter, S.S., during the period between September 1, 1992, and December 1, 1992, when S.S. was under the age of 18 years. The third charge against Plaskett stemmed from the alleged lewd fondling of S.S., which occurred between March 1, 1993, and April 27, 1993, when she was under the age of 18 years.

At the age of 22, defendant married Sherry. They had two daughters, Adrienne and Carly. He and Sherry divorced in August 1983.

Defendant married Norma in September 1983, when Norma's daughter, A.W., was a baby. Norma was never married to A.W.'s biological father, and A.W. did not know him. In February 1984, defendant adopted A.W.

Defendant and Norma separated on January 23, 1991. Their divorce became final on May 1, 1991, and a month later Norma married Jerry. In October 1992, defendant agreed to relinquish his parental right to A.W. and Jerry adopted her.

In July 1991, defendant began dating Valerie. In September 1991, they were married. Valerie had two daughters, S.S. and M.S. Valerie had divorced their father and left Pennsylvania with her daughters in August 1990.

A.W. was born January 28, 1982. She was 16 years old at the time of trial. When A.W. was 12 years of age, in the fall of 1994, she became a patient-resident at Crittenton Hospital, a children's

psychiatric facility. A.W. was admitted to the psychiatric hospital after a teacher intercepted a note A.W. passed to a friend in which A.W. wrote about doing research into the occult and nearly passing out by "overdosing" on a variety of prescription and over-the-counter medicines. When first at Crittenton, A.W. was assigned to a psychologist "who didn't have much experience working with issues around sexual abuse and didn't feel comfortable working with [A.W.] and her family." Thus, A.W.'s care was transferred to Jane Heavin. A.W. told Heavin that she had been abused from the time she was about 4 years of age to when she was 8 or 9. A.W. also told the therapist that when she was 11, she had told her mother of the sexual abuse and that her mother got her into therapy. A.W.'s mother testified that before A.W. was admitted at Crittenton, she was unaware that her daughter had been sexually abused.

At trial A.W. testified that defendant physically abused her from when she was approximately 3 years old until she was 8 or 9 years old. She testified that he sexually abused her in 1991 when she was 9.

According to A.W., the physical abuse took several forms. She testified that defendant whipped her with a belt "too many times for me to count." Defendant had her take off her underpants and lean across her bed while he used a full-arm swing to hit her with a belt, sometimes with the buckle. Sometimes she bled. Other times defendant threw her on the floor and pushed her down and once pushed her into a counter. Three or four times when A.W. was 3 or 4 years old, defendant sat on her and hit her with his closed fist from her chin to her rib cage. In addition to his physical abuse of A.W., defendant tormented A.W.'s pets and threatened to hurt her mother.

A.W.'s mother testified that she had seen bruises on A.W.'s buttocks and the backs of her legs on one occasion when A.W. was between 2 and 5 years old. Norma spoke to defendant about it.

The sexual incidents that A.W. described in her trial testimony took place at defendant's apartment during her overnight visits after defendant and Norma separated and before he married Valerie. Defendant would put on the movie "Body Heat," and he and

A.W. would sit on the sofa together to watch it. A.W. testified that defendant would become aroused and pull her to him. He would put one hand over her breast and the other hand between her legs. "[H]e would fondle me and caress my clitoris." A.W. denied that defendant inserted his finger into her vagina and stated that during these incidents, defendant was fully clothed, his pants were not unzipped, and he did not masturbate or "climax." A.W. estimated that the incidents lasted from 2 to 5 minutes each and that there were between 10 and 20 incidents. In addition to making her watch "Body Heat" with him, defendant showed A.W. videotapes of grown men and women having sex. A.W. testified that she forgot about these incidents around the time they happened, and then when she was about 11 years old the memories began resurfacing.

Defendant denied any physical abuse of A.W. He denied mistreating any pets.

Defendant denied ever touching A.W. in a sexual way. He testified that he and Norma had owned a videotape of "Body Heat," but he denied ever watching it with A.W.

S.S. was born January 28, 1978. She was 20 years old at the time of trial and lived in Pennsylvania with her father and her younger sister, M.S. On April 27, 1993, while living in Olathe, Kansas, she spoke with the Olathe police and reported being sexually abused by the defendant. She reported two types of incidents.

. The first occurred between September and December 1992 when the defendant came into her bedroom in the middle of the night on five or six occasions. According to S.S., defendant climbed into bed with her, he felt her breasts, and once or twice he felt around the area of her vagina. She was clothed, and defendant did not put his hands inside her clothing. S.S. testified that she pretended to be asleep and rolled over, which made defendant stop. Defendant was wearing shorts or "boxers" and touched her only with his hands.

The second was a single incident that occurred at defendant's photography studio on March 29, 1993. S.S. testified that she went to her boyfriend's house after school. Defendant picked her up there and took her to her orthodontics appointment. After her appointment, they went to the Metcalf South Mall to do some

packing at defendant's photography studio, which was going out of business. While S.S. packed, defendant left for awhile and returned with a box of condoms. He told S.S. that she needed to know how to use a condom. Standing approximately 8 to 10 feet from S.S., defendant pulled his pants down and started masturbating. He told S.S. that she would have to put a condom on him, and she refused. He insisted, and then S.S. complied. S.S. put the condom on his erect penis, defendant masturbated until he ejaculated, and then he took off the condom and threw it away. This incident occurred between 5 and 6. After it happened, according to S.S., "[w]e just packed up a few more things, and then we left the store." S.S. did not tell her mother. As a result of S.S.'s reporting these incidents to police, she immediately was put into foster care where she stayed for several months and eventually went to live with her father in Pennsylvania.

Defendant denied going into S.S.'s bedroom in the middle of the night and fondling her. Defendant denied that the condom incident occurred.

S.S. testified that she and A.W. were not friends, and she denied talking with A.W. about being sexually abused by defendant. A.W. said that she and S.S. did not get along well, and she denied knowing at the time she disclosed defendant's sexual abuse to her therapist that S.S. had accused defendant of sexually abusing her. The three-count complaint was filed against defendant on March 21, 1997.

Plaskett raises the following issues on appeal:

1. Was the testimony of Plaskett's expert witness on the subject of repressed and recovered memory erroneously excluded?

2. Was A.W.'s testimony of repressed and recovered memory erroneously admitted?

3. Was A.W.'s testimony erroneously admitted for the reason that it had been refreshed by hypnosis or a hypnosis-like process?

4. Was Detective Langer improperly permitted to express his opinion as to the defendant's guilt?

5. Did the trial court abuse its discretion in refusing to admit a clinical record written by a counselor who had treated A.W. but did not testify?

6. Did the trial court erroneously refuse to admit evidence of A.W.'s consensual sexual activity?

7. Was testimony that A.W. fit the profile of a sexually abused child improperly admitted and rebuttal evidence improperly excluded?

8. Did the trial court abuse its discretion in excluding evidence of letters and taped telephone conversations between S.S. and her biological father, who did not testify?

9. Did the trial court abuse its discretion in refusing to sever charges for separate trials of counts based on the allegations of A.W. and S.S.?

10. Did the trial court erroneously sentence defendant to a term of years not authorized by the statute?

11. Should the trial court have instructed the jury on the lesser included offense of battery?

12. Did cumulative trial errors deprive Plaskett of a fair trial?

A.W. testified that she was 9 years old when defendant sexually abused her. She also testified that there was a period of time in which she did not have conscious memories of defendant's conduct. Her memory fluctuations are set out in the following questions and answers on cross-examination:

"Q. [Defense counsel] Okay. When did you first start having these memories of sexual abuse?
"A. I think when I was about 11.
"Q. Now, I want to understand what you're saying there. Is it your testimony that you didn't know or remember these things that happened before then, then these things came back to you? Or what are you saying?
"A. I kind of like pushed them out of my mind, and they started coming back up and resurfacing. So I guess you could say I was just starting to remember them again.
"Q. So in 1991, you remembered from March, that that's when it started, until September that they were happening, knew they were happening then?
"A. Yes.
"Q. Okay. And when did you push them out of your mind?
"A. I can't say.
"Q. Was it during that time frame, during the time it was happening to you, or did a year go by and then all of a sudden you pushed them out of your mind, then remembered them two years later?
"A. It was probably while it was going on.
"Q. Okay. So after each incident you forgot about it? Is that what your testimony is?
"A. No.

"Q. How long would you remember it and then forget about it?
"A. I really don't know."

The following direct examination related to A.W.'s disclosure of sexual abuse:

"Q. [Prosecutor] Now, by 1994, three years later, you still have not told anyone. Is that correct?
"A. That's correct.
"Q. Is there a time where, when you become depressed, your mom enters you into some counseling with an outpatient therapist?
"A. Yes, sir.

. . . .

"Q. At some point during your treatment for the depression, did you disclose to workers there, and specifically Jane Heavin, that you had been sexually abused?
"A. Yes, sir.
"Q. Now, who was Jane Heavin in terms of the part she played in your stay at Crittenton?
"A. She was a social worker that I met with a few times a week, and she supervised the family meetings with my parents.
"Q. Did you have quite a bit of contact with her over the time you were in there?
"A. Yes, sir.
"Q. Did you disclose to her in fact what you've told us here today about the incident with Body Heat?
"A. No. I don't remember giving her any details.'
"Q. Okay. And you're not sure whether you did or not, but you did tell her about the incident with Dan Plaskett?
"A. Yes, sir.
"Q. Had you told anyone else about the abuse at that time?
"A. A few months later, I told my mother.
"Q. Okay. But you don't recall having told her before that?
"A. No.
"Q. Do you remember telling anyone at the hospital that you had told your mother?
"A. No, I don't."

The following cross-examination related to A.W.'s disclosure of sexual abuse then occurred:

"Q. [Defense counsel] [A.W.], when is the first incident that you claim you were sexually abused? That you remember?
"A. Do you want a specific date—
"Q. Well, as close in time—I'm not asking for the impossible. As close a time as you can remember.
"A. It was probably in spring of 1991.

"Q. Okay. So it was after Dan Plaskett had moved out and had separated from your mom, correct?

"A. Correct.

"Q. Which was January 23, or about that date, of '91?

"A. Yes.

"Q. So your testimony is you think it was sometime in the spring of '91 was the first time that ever happened?

"A. Yes.

"Q. Did you tell other people that you were sexually abused prior to the time, from the time you were about 2 or 3 up until the time you were 8 or 9?

"A. I don't remember ever telling anybody that.

"Q. Are you saying you don't remember, or you didn't do that?

"A. I don't remember.

. . . .

"Q. All right. Now, when you talked to Detective Langer and Libby Marks on December 15, 1994, you told them some of the same things you told Mr. Hymer and this jury in court today; is that correct?

"A. That's correct.

"Q. All right. You told, I believe—is it correct that the first person you told was Jane Heavin at Crittenton about the sexual—alleged sexual abuse?

"A. Yes.

"Q. And then you told your mom after that; is that correct or incorrect?

"A. That's correct.

"Q. And who was the next person you told?

"A. Janet Snower.

"Q. Okay. Now, when you told Jane Heavin, did she ask who the alleged abuser was?

"A. I don't remember telling her. I don't remember telling her any details at all.

"Q. What's the best memory you have of what you did tell her then, Jane Heavin?

"A. I just—what I remember is just letting her be aware that I was sexually abused.

"Q. She didn't ever ask you who would have done it?

"A. I don't remember.

"Q. Were you having problems with your memory during the time you were at Crittenton?

"A. No.

"Q. But that's something you don't remember or wouldn't remember?

"A. It was four years ago."

On direct examination, A.W. testified in some detail about the sexual abuse she suffered at the hands of the defendant. She was testifying to events which occurred when she was 9 years old. She was 16 years old at the time of trial. She first told others about the abuse when she was 11 years old. She was not an "adult" woman

recalling for the first time the sexual abuse she endured as a child. She was a child testifying to what occurred to her at an earlier age.

At oral argument, counsel, in response to a question from the court, acknowledged that they knew of no case similar to the present case where the issue of repression was raised as to a child recalling sexual abuse occurring earlier in his or her childhood. The appendix to the *amicus curiae* brief contains an article entitled *Can memories of childhood sexual abuse be repressed?* by Harrison G. Pope Jr. and James I. Hudson, 25 Psychological Medicine, at 121-26 (1995). The article discusses the criteria necessary to demonstrate the existence of repressed memory of childhood sexual abuse. The first is to confirm that the traumatic event (sexual abuse) did occur. Second, is to establish that the victim developed "psychogenic amnesia" resulting from the trauma. In that regard, "one must first exclude cases in which victims simply tried not to think about events, pretended that the events never occurred, or appeared to derive secondary gains by merely claiming to have amnesia." Finally, the failure of memory must exceed "ordinary forgetfulness."

There is no claim nor does the record reflect that A.W. suffered from amnesia as a result of the sexual abuse. When she was asked if she forgot each incident after it occurred, she said no. A.W. was a 16-year-old girl testifying to acts of sexual abuse that occurred when she was 9 years old. She was testifying as to her best memory of what had occurred. The record does not support a finding that A.W.'s testimony resulted from false or repressed and recovered memory.

Nor does the record support that A.W.'s testimony had been refreshed by hypnosis or a hypnosis-like process called "guided imagery."

Jane Heavin testified at the pretrial hearing that she was unaware of hypnosis being used at Crittenton. When asked if she was aware of the use at Crittenton of any techniques to revive memories, she answered: "Not through hypnosis, or guided imagery, or anything like that, no."

At trial, Heavin described using guided imagery with A.W.:

"At Crittenton, it's a brief strategic—it's like crisis intervention. So what I specifically dealt with with [A.W.] was crisis intervention in terms of coping skills, getting her to identify her own strengths, getting her in touch with her feelings, getting her in touch with her body in terms of allowing herself to feel hunger, allowing herself to feel physically as well as emotionally, and coping with some of the memories that were coming back.

"And in terms of some relaxation things, some guided imagery things, just a variety of coping skills is what I worked intensely with [A.W.] on."

Heavin denied that the guided imagery had "anything to do with the sexual allegations." She gave this description:

"Guided imagery, what I used specifically was a program that I received from David Oldfield who wrote up a program called "The Journey," and basically it deals with the crisis of adolescence.

"And the imageries that we used in there was with some—it's like relaxation music, and it's a guided kind of a thing where the kids are invited to go back to a safe place and imagine themselves there, and then from that being called by something or someone to take a journey, to take an experience. And it leads them through a labyrinth of life and what kind of challenges that they have to overcome or face in order to move on, you know."

Defendant would have the court view Heavin's pretrial hearing testimony as contradicting her trial testimony. Although Heavin's testimony is not very clear, on this subject as well as others, it does not appear to be contradictory. What she denied at the pretrial hearing was the use of guided imagery for the purpose of restoring memories. The use of guided imagery that she described at trial was for the purpose of coping with life's events. Thus, although Dr. Terrance Campbell testified that there is no significant difference between guided imagery and hypnosis, that does not signify that guided imagery necessarily was used by Heavin for the purpose of restoring repressed memories. Heavin testified otherwise, and the determination of her credibility was a question for the jury.

When the evidence is viewed in the light most favorable to the prosecution, however, we must say that there is no evidence of hypnosis and it does not appear that A.W.'s recalled memories of sexual abuse were products of hypnosis-like techniques.

Defendant called Dr. Campbell as his expert witness on psychological matters. After hearing a proffer of Dr. Campbell's testimony, the trial court ruled that the witness could testify but not

on the subject of "False Memory Syndrome." The trial court stated:

"I have heard the arguments on this for an hour and a half, particularly as to [A.W.] . . . . Dr. Campbell, when I asked him directly, denied that this is an issue of repressed memory. But what he has said in his testimony was that events were suggested to [A. W.] in various ways, and she accepted those suggestions and assumed that they were fact. That's a false memory. I don't know how you get around it. You've dressed it up, but it's false memory.

"And I do believe strongly, based on what I know and what I've heard, that False Memory Syndrome is not generally accepted in the expert's particular scientific field. It's not accepted as a syndrome. Not accepted as one.

. . . .

"Bottom line is, as to [A.W.], I'm not going to allow expert testimony that in effect, in this Court's opinion, amounts to nothing more or less than False Memory Syndrome, an evaluation that leads right to that.

"I am going to allow Dr. Campbell to testify about [S.S.] I note in his qualifications here somewhere that he is a Ph.D. in human development and clinical psychology since 1970, that he's written a number of articles and publications, been involved in a number of organizations and groups related to his training; that specifically he has written a publication called 'Child Custody Evaluations and Appropriate Standards of Psychological Practice'; further, that he has written 'Psychotherapy with Children of Divorce: The Pitfalls of Triangulated Relationships.' That was written in 1992, published in Psychotherapy.

"And I think that his testimony as an expert on the effects of divorce and custody issues is valuable, would help the jury in this case.

"As to this Beginning to Heal, I don't care who testifies to it. I think it's related to evidence that's admissible and has come into evidence, and I don't care how you present that, Mr. Moore. If you want to present it with Dr. Campbell, that's fine with me since he reviewed it and he apparently got out this information. So if that's what you want to do, that's fine."

Dr. Campbell testified about children generally being affected by their parents' acrimonious divorces. With regard to S.S., the witness found evidence of frustration and aggression that were heightened on April 27, 1993, when her expectations of a change of custody were dashed.

With regard to the books *Courage to Heal* and *Beginning to Heal*, Dr. Campbell testified that the authors were not psychologists and that both books contained "serious misinformation." The witness prepared a chart, which was admitted into evidence as defendant's Exhibit 99, of parallels between statements made by A.W.

and passages from *Beginning to Heal*. See Bass and Davis, *The Courage to Heal: A Guide for Women Survivors of Child Sexual Abuse* (1992), and Bass and Davis, *Beginning to Heal: A First Book for Survivors of Child Sexual Abuse* (1993).

While Dr. Campbell was on the stand, defense counsel obtained permission to have the witness testify about behavioral indicators of childhood sexual abuse. A.W.'s Crittenton therapist already had testified that A.W. exhibited a number of such indicators, including her superficial attempt to overdose, trouble sleeping, nightmares, losing weight, not eating, increased anger, yelling, being oppositional, lots of problems at school, and withdrawing from friends. Dr. Campbell testified:

"Behavioral indicators are used in a mistaken attempt at trying to identify people who have been sexually abused, but they fail.

. . . .

"[R]elying on behavioral indicators of abuse will lead the uninformed professional who does it into making an unacceptable frequency of mistaken classifications where they conclude that an individual has been sexually abused when in fact that individual has not been sexually abused."

What Dr. Campbell was not allowed to testify about is whether children cope with childhood sexual abuse by blocking the memory of it. He would have testified that the assumption of a relationship between traumatic experience and repressed memory is premised on Freudian theory, most of which is "thoroughly discredited." He would have testified that no scientific report relates traumatic experience and repression and that "the relevant scientific evidence clearly demonstrates that traumatic experiences are remembered vividly and continuously." Finally, Dr. Campbell would have testified that A.W.'s "memories [of sexual abuse] could very, very easily and likely have developed as a result of a combination of suggestibility, imagination, and the influences of other adults surrounding [her], including the various professional personnel, therapist personnel that she's interacted with, . . . [as well as] the influences of the book Beginning to Heal which [she] testified she . . . read."

As we have seen, the trial court would not permit Dr. Campbell to testify on the subject of repressed memories of childhood sexual

abuse on the ground that "False Memory Syndrome is not generally accepted in the expert's particular scientific field" of psychology. The trial court, likewise, would not permit the witness to testify about ways other than from experiencing sexual abuse that A.W. might have developed her story on the ground that it "bears directly on False Memory Syndrome." Since we have concluded that there was no showing that A.W.'s testimony was the result of false or repressed and recovered memory, there was no error in not permitting Dr. Campbell to testify on the subject.

We next consider if the trial court erred in permitting Detective Langer to express his opinion as to the defendant's guilt. On cross-examination, defense counsel asked Detective Langer about how young persons who disclose incest to the police are treated. With particular reference to A.W., the detective testified: "We're telling her she's doing a good job because quite often in cases like this it's hard for kids to disclose things that have happened like this to strangers, and it's often that we do praise them for coming forward and telling the truth. And it's hard. And we praise them for that, for doing something that's as hard as it is." These questions and answers followed the detective's statement:

"Q. You just said you praise kids like this for coming forward and telling the truth?
"A. Tell them they do a good job, yes.
"Q. But your last answer was, we praise kids for coming forward and telling the truth. Did you say that?
"A. I said that, but it's—
"Q. Now, my point is this, and my question is this: That assumes they're telling the truth, doesn't it?
"A. It's hard for a child to come forward, whether it is the truth or not—but in this case I believe it is the truth—for a child—"

Defense counsel asked that the detective's declaration of belief in the truth of A.W.'s story be stricken. The trial judge overruled the objection.

On appeal, defendant relies on *State v. Steadman*, 253 Kan. 297, 855 P.2d 919 (1993). In that case, defendant's murder conviction was reversed on the ground that police witnesses were permitted to testify that in their opinions the defendant was guilty of the crime and exhibited the pressure felt by a guilty person. 253 Kan.

at 303-04. The rule articulated by the court was that "[i]n a criminal trial, the defendant has the right to have the jury determine from the evidence whether the defendant is guilty or not." 253 Kan. at 304.

More on point are cases cited in defendant's reply brief concerning the rule that a witness may not express an opinion on the credibility of another witness. In *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986), the court held that it was reversible error for the trial court to have permitted two expert witnesses to express their views on the reliability of the statements of the complaining witness. The court stated:

"[T]he witnesses attempted to serve as human lie detectors for the child and both told the jury that in their professional opinions the child was truthful and the defendant was guilty as charged. We are convinced that it was the function of the jury to hear the testimony of the witnesses as to what the child said, and then to make a determination of the reliability of the child's statements."

In other cases where one witness had been allowed to comment on the credibility of another, for example, *State v. Mullins*, 267 Kan. 84, 94-96, 977 P.2d 931 (1999), the harmless error rule has been applied. However, in *Mullins*, the question to the expert witness was whether there was anything about the evaluation of the victim that caused the expert to be concerned that the victim was coached. We found the question to be improper since it implied truthfulness, but concluded it was harmless, noting: "Technically, as prohibited by *Lash* and *Jackson*, the question asked of Phillips does not allow the giving of an opinion that B.M. had been sexually assaulted by Mullins or render an opinion that he was telling the truth." The State argues that Detective Langer's expression of faith in the veracity of A.W.'s disclosure was harmless error. The State's contention is that Detective Langer's further testimony rendered it even more harmless by clarifying that he believed A.W. at the time she made her disclosure to him but, if his investigation proved otherwise, he was capable of modifying his opinion. Contrary to the effect the State seems to think this testimony would have, its effect could only have been to reinforce Detective Langer's earlier expression of faith in the truth of A.W.'s disclosure by implying that in this case further investigation supported it rather than dis-

credited it. The trial court erred in allowing Detective Langer to express his opinion as to whether A.W. was telling the truth. As we said in *Jackson*, the determination of the truthfulness of the victim is for the jury and not an expert witness.

We next consider the admissibility of the clinical record written by a counselor who had treated A.W. but did not testify. The trial court refused to admit defendant's Exhibit 105 into evidence. As we have seen, the trial court also expressed doubts about the opinion of defendant's expert witness, Dr. Campbell, because he had reviewed Exhibit 105 and relied on it to some extent in forming his opinion. Exhibit 105 consists of clinical records regarding A.W. that were released to Crittenton by Karen Rexroad, who was a therapist who saw A.W. and other members of her family on an outpatient basis before A.W. was admitted to Crittenton. Defense counsel wanted to offer Exhibit 105 along with other medical records, but Exhibit 105 presented the complicating factor that Rexroad, who made the notes, had died before trial began. Defense counsel argued that Exhibit 105 was admissible pursuant to K.S.A. 2000 Supp. 60-460(a), which provides that statements made and recorded by a person who is in court subject to cross-examination are not hearsay. His argument was that Rexroad simply wrote down what her clients, in particular Norma [A.W.'s mother], said. When the trial judge refused to admit Exhibit 105, the witness on the stand was Dr. Vasantha Karan, a psychiatrist employed at Crittenton. The trial judge ruled: "Exhibit 105 is the other exhibit that's been offered, and I don't think there's appropriate foundation for that to be admitted into evidence. There is no indication that this witness has relied on that information, in addition to that other foundation required for it to be admitted into evidence."

Rexroad's clinical records are handwritten. They begin with an entry dated May 12, 1994, which begins with A.W.'s name underlined and the note: "Norma present for a time." The next entry is dated May 23, 1994, and it, too, has A.W.'s name underlined. The notes in each of the first two entries reflect that A.W. was saying the things that the therapist wrote down. The third entry is different, and it is the one that defendant was particularly interested in having admitted into evidence. It is dated May 31, 1994. Instead

of A.W.'s name being underlined at the beginning, the May 31 entry has the names, Norma + Jerry, underlined. That entry states in part:

"Has always had problems w/peers. Frequently upset in past that no one likes her. Teachers have said that she is bossy. If other kids want to do something different than what she wants she goes off alone. Won't join in even if invited. Her way or no way. Even best friend Lillie is getting fed up. All of a sudden for no apparent reason will go into a bad mood pout. Attitude was so bad that cut her off from summer camp unless changes made—her choice. Has been better since. Can do bad attitude for days. *Dan x husband would put arm around her rest hand on her breast put hand on thigh under nightgown. Walk in on her in the bathroom. Remembers waking up one morning with dry crusty stuff on her belly. Is sound sleeper.* Dan would berate her if she lost at sports. Could never do anything right. At least 1x/wk asks Jerry if he loves her. Zach 23. Travis 18 at home. Feel [A.W.] acts angry + tough to cover up intense sadness.

"Tell her to take attitude to her room. Set time for talking not at bed. Give just because you are here. No conditions." (Emphasis added.)

With Norma on the witness stand, defense counsel asked the trial judge to reconsider the ruling on Exhibit 105:

"We're back to Karen Rexroad now, Judge, and I need a decision. If you're not going to allow it, you're not going to allow it, but there's some information here that is frankly critical to our defense.

"It indicates that in 1994, Norma and Jerry met with Karen Rexroad and disclosed sexual abuse three or four months prior to the time [A.W.] was admitted to Crittenton. . . ."

Defense counsel cited K.S.A. 2000 Supp. 60-460(d). The trial court ruled the records were not admissible under 60-460(d) but allowed defense to show it to Norma to refresh her memory and ask her questions about what she told Rexroad at the meeting.

Accordingly, defense counsel showed Rexroad's records to Norma and asked if they refreshed her recollection of her and Jerry meeting with Rexroad. She testified that she did not have any independent recollection of meeting with Rexroad. She testified that she did not remember telling Rexroad that her former husband put his hand or head on A.W.'s breast and his hand on her thigh. Norma reiterated her earlier testimony that the first time she was aware of sexual abuse of A.W. was when A.W. was at Crittenton.

On appeal, defendant argues that the trial judge's exclusion of this evidence amounted to denial of the fundamental right to present evidence in his own defense. His contention is that this notation shows that Norma rather than A.W. is the one who originated the idea that defendant sexually abused A.W.

Defendant's principal argument on appeal seems to be that K.S.A. 2000 Supp. 60-460(a) authorizes admission of at least that part of Rexroad's records that reflect statements made by Norma, who was called as a witness at trial. He suggests that 60-460(d)(3) would apply if Rexroad, who wrote the notes, is deemed to be the declarant.

The State's response on appeal focuses on particulars of who cited and offered what at various times at trial. What the State seems to be getting at is that defense counsel did not properly communicate the defense theory with regard to this exhibit to the trial judge. Review of the arguments presented to the trial judge do not bear out this proposition. Defense counsel clearly communicated the significance of the exhibit.

On appeal, the State also asserts that defendant for the first time suggests that the exhibit is not hearsay evidence. It appears from the portion of the trial transcript cited by defendant that the question of the admissibility of Rexroad's records was a topic of discussion throughout the trial and perhaps in pretrial proceedings as well. After examination of defendant's expert witness, Dr. Campbell, concluded, defense counsel again brought up admission of Rexroad's medical records. The trial judge stated, "I'll be glad to have another hearing on that. Again, I am concerned as to what exception they fall under. Number 2, if they are in handwritten form, that the jury might ascribe their own interpretation to that writing." Defense counsel responded, "[A]gain, they come under 60-460(a), which basically says, Judge, it's not hearsay if statements are made and recorded by a person who is in court subject to cross-examination."

Medical records generally are admitted into evidence under K.S.A. 2000 Supp. 60-460(m), as writings offered as memoranda or records of acts. Rexroad's records, it appears, were obtained from Crittenton. The front page of the exhibit is an authorization

for release of information form with Crittenton's heading. It is directed to Rexroad and signed by Norma. The second page is a note signed by Rexroad indicating that her clinical records on A.W. were enclosed and transmitted to Crittenton pursuant to the authorization. Dr. Karan's identification of defendant's Exhibit 105 confirms that it consists of Crittenton's copies of Rexroad's records.

Defendant's purpose in introducing Rexroad's medical records was not as a record of A.W.'s treatment but rather as a record of Norma's telling Rexroad in May 1994 of defendant's sexually touching A.W. That portion of Rexroad's record was an out-of-court statement made by A.W.'s parent, not offered to show that defendant actually touched A.W. in a sexual way but rather to show that her mother made the allegation and that she did so in May 1994. The use the defendant attempted to make of Exhibit 105 was impeachment of Norma's previous testimony. In the State's case, Norma testified that it was not until October 1994, when A.W. was at Crittenton, that she first suspected defendant of sexually abusing A.W. Norma also testified that she first learned of defendant's sexually abusing A.W. from A.W.'s Crittenton therapist, Jane Heavin. And she testified that A.W. did not tell her before she went to Crittenton that she had been sexually abused. Thus, if for no other reason, defendant's Exhibit 105 should have been admitted for impeachment purposes. Defense counsel was allowed to ask Norma if she told Rexroad at any of the meetings that defendant put his hand on A.W.'s breast and thigh under her nightgown. Norma responded that she did not remember telling her that. Although counsel was stuck with her answer, the jury was made aware that Norma may have done so. However, it does not show Norma originated the idea of sexual abuse, nor did it deny defendant the right to present evidence in his own defense.

Defendant next argues that the trial court erroneously refused to admit evidence of A.W.'s consensual sexual activity. Heavin testified that A.W. displayed characteristics consistent with being a victim of sexual abuse. Among those indicators, she testified, is greater knowledge of sexual matters than other children of the same age. Helen Swan, a social worker specializing in the area of child sexual abuse, validated the indicators: "I've never been to a

training conference or read any literature that say indicators of abuse are not highly significant to the indication of child sexual abuse." Swan also said that advanced sexual knowledge is a common indicator.

The testimony of Adrienne and Carly Plaskett was proffered on the subject of what A.W. had told them about a consensual sexual adventure she had. Adrienne said that A.W. told her and Carly that one time she went down into the storm sewer with a guy and tried to have consensual sex. Adrienne said that A.W. was in third or fourth grade at the time and that A.W. was "kind of bragging about it . . . . was kind of proud of it." Adrienne said that she did not know whether the story was true and that she did not believe it at the time. She concluded by stating that A.W. "always was kind of sexually interested with people." Carly corroborated Adrienne's testimony.

On appeal, it is argued on defendant's behalf that it was error for the trial judge to exclude the testimony of Adrienne and Carly because it should have been admitted for the purpose of explaining how A.W. acquired her precocious sexual knowledge. That, however, is not the purpose for which their testimony was proffered.

The testimony of Adrienne and Carly was proffered, along with the testimony of Charles Rollins, to show other instances of A.W.'s accusations of sexual activity. *State v. Barber*, 13 Kan. App. 2d 224, 766 P.2d 1288, *rev. denied* 244 Kan. 739 (1989), was at the center of the discussion. Syllabus ¶ 3 of *Barber* states: "Evidence of a complaining witness's prior accusations is admissible only after the trial court makes a threshold determination that a reasonable probability of falsity exists." The trial judge in the present case did not believe that the subject of Adrienne's and Carly's testimony was an accusation. It was, instead, a bragging account of consensual sexual activity. There was no error in refusing to admit the evidence.

Next we consider if the testimony that A.W. fit the profile of a sexually abused child was improperly admitted and rebuttal evidence improperly excluded. In addition to the testimony cited in the discussion of the previous issue, defendant on this issue cites Heavin's testimony that weight loss was an indicator of sexual abuse. In response to Heavin's testimony, defendant sought to in-

troduce defendant's Exhibit 91. Exhibit 91 is a Nutrition Assessment Form with a Crittenton heading. The following handwritten note appears in a section of the form labeled "Significant Findings, Comments and Plans": "Pt states that she thinks she is overweight and that her mother tells her she is fat. Pt said 'my mom gets mad at me if I eat too much.' Pt is scared to gain wt."

Defendant offered the exhibit while A.W. was testifying. The trial judge refused at that time to admit the exhibit: "But with this witness, as to that exhibit, which is certainly—there's been no allegation she created that exhibit or agrees to the statement in that, and we don't know who the author of that exhibit was. I'm not going to admit it at this time with that foundation."

Defense counsel responded: "Then at the appropriate time over the lunch break I'd like to take up again the question of records, because this is what is going to happen every time. Thank you." On appeal, the court is not directed to any other part of the record for further discussion of the admissibility of this part of the Crittenton records. The argument is made that no further foundation was necessary at that time and that the record should have been admitted under K.S.A. 2000 Supp. 60-460(a) or (l). K.S.A. 2000 Supp. 60-460(l) provides the following hearsay exception:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(l) *Statements of physical or mental condition of declarant.* Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant or (2) previous symptoms, pain or physical sensation, made to a physician consulted for treatment or for diagnosis with a view to treatment, and relevant to an issue of declarant's bodily condition."

In addition to the argument that defendant should have been permitted to introduce the Nutrition Assessment Form in order to show that A.W.'s weight loss might have had significance other than as an indicator of sexual abuse, it is argued at length that Heavin

and Swan should not have been permitted to testify on the subject of indicators of sexual abuse. In *State v. Reser*, 244 Kan. 306, 315, 767 P.2d 1277 (1989), the court approved similar testimony given by Swan on this same topic:

"After a careful review of the foregoing cases, we conclude that Helen Swan, who is licensed as a clinical specialist, with a master's degree in social work, years of experience in the field of child sexual abuse and with world-wide recognition in the field of child sexual abuse, is imminently qualified as an expert to testify as to common patterns of behavior resulting from child sexual abuse and that this victim had symptoms consistent with those patterns."

Defendant asks the court to consider overruling *Reser*. We decline to do so.

Defendant next argues that the trial court abused its discretion in excluding evidence of letters and taped telephone conversations between S.S. and her biological father. Four letters written by Roger, former husband of Valerie and the father of S.S. and M.S., were marked as defendant's Exhibits 34, 37, 38, and 51. The envelopes with Exhibits 34 and 38 bear his return address.

Both envelopes are addressed to her friend T.T. and show in the lower left corner that the intended recipient was S.S.

In a pretrial memorandum of the defense theory, the trial court was advised that defendant intended to use letters written by Roger to his daughter and mailed to her at a friend's house to show how he encouraged S.S. to supply him with information useful in his ongoing custody battle and to defy discipline imposed by her mother and defendant. The letters show that Roger actively fostered his daughters' hopes of returning to live in Pennsylvania. The trial court was advised that the evidence would show that S.S. went to the police and made her allegations of sexual abuse against defendant on the day that her hopes and expectations of returning to Pennsylvania on a change of custody were dashed.

At trial defense counsel asked S.S. to identify defendant's Exhibits 34, 37, and 38. S.S. identified the handwriting as that of her father, identified T.T. as a friend, and identified herself and her sister as the intended recipients of the letters. S.S. denied any specific recollection of any of these letters and testified: "He wrote us

all the time." She estimated that he wrote between 12 and 24 letters a year.

Defense counsel questioned S.S. about the contents of the letters by asking specific questions such as, "Did your dad ever tell you to call 911 if Dan ever tried to discipline you?" and "Did anybody . . . ever tell you to cry rape against Dan?" She answered, "My dad may have said that. I'm not positive if those were the exact words, either." S.S. was then asked, "Did your dad ever tell you to kick Dan Plaskett in the balls?" She answered, "He may have said that on occasion." Then defense counsel asked S.S.: "Did your dad ever tell you that you didn't have to take any, quote, shit, end quote, from either one of them, meaning your mom or dad?"

The prosecuting attorney objected: "Judge, I've kind of let this go from a lot of quotes from somebody who's not here on a hearsay basis. They started off as less specific things. I don't know, unless Mr. S. is going to be here, it's probably unfair that we're attributing all these statements to him." Defense counsel told the court that Roger was not available as a witness. The trial judge asked defense counsel to comment whether hearsay was involved. Defense counsel responded: "It goes to state of mind and what was said to a person who is here in court testifying, and it's not necessarily uttered for the truth, but to show the state of mind of what was going on." The trial court sustained the hearsay objection as to the specific question the State objected to. Defense counsel continued to ask S.S. questions such as: "Were you ever told to contact legal aid and claim child abuse?"

At the end of the defendant's case, a number of exhibits were offered, including defendant's Exhibits 34, 37, 38, and 51. The State objected to admission on the grounds that the letters lacked relevance and contained hearsay. The trial judge excluded the letters: "There are real hearsay issues related to the author of those letters which has been stated to the Court to be Roger [S.], so I'm going to sustain the objection to those being admitted."

Tape recordings of telephone conversations between Roger and S.S. and M.S. were offered into evidence. In offering the tape recordings, defense counsel stated:

"These are tape recordings of some of the telephone conversations Roger [S.] had from Pennsylvania with his daughters, [M.S.] and [S.S.], in which he would variously encourage—number one, the girls would say they wanted to go live with their dad in Pennsylvania.

"We believe there's evidence in these tapes of a motivation to lie and to make up, do whatever it takes to get in a position where they can get out of the home of Valerie and Dan Plaskett, [to] go live with Roger [S.] in Pennsylvania.

"There's also on one of these tapes, Exhibit 44, a statement, a conversation between [S.S.] and a young man by the name of Dusty when [S.S.] said she can cry whenever she wants to, as she did here in court."

The State responded:

"Judge, I think they were not properly tape-recorded initially. We had a previous hearing on that matter. Additionally, Judge, I would point out for the record my understanding and my review of the record is there was no attempt made to compulsorily serve Roger [S.] out of state, Pennsylvania.

"His address has been constant throughout the pendency of this hearing. No attempt was made to get him here by the defense. And all of the tapes obviously by their definition contain hearsay."

The trial judge agreed that "there are hearsay issues related to those cassette tapes." As a fallback, defense counsel offered the tapes "to show what [S.S.] said to Roger." The trial judge rejected the offer for that purpose as well: "Again, that would have certainly been appropriate to refresh her recollection as to what she may or may not have said on those tapes, so you're certainly entitled, if you would like to use them for that purpose, but otherwise I'll deny that."

On appeal, the argument is made that the trial court's rulings on hearsay were in error. It does not appear that any of the statements contained in the letters or tapes were offered to prove the truth of the matter stated. Hence, hearsay was not a basis for excluding them.

The rule that ought to have been applied to the writings is simply that there must be some authentication of a writing. K.S.A. 60-464 provides that "[a]uthentication may be by evidence sufficient to sustain a finding of its authenticity." In this instance, S.S. identified the letters as ones written by her father to her. S.S. denied that she remembered the particular letters shown to her, but she raised no question about the authenticity of the letters and implied

that she received too many letters from him to be able to remember each of them. The letters were adequately authenticated.

The State also argued that the letters were not relevant. The letters, however, seem quite relevant to the defense theory that Roger encouraged S.S. to despise defendant and to use whatever means might be effective in achieving a change of custody, including fabricating allegations against defendant.

Authentication also is the issue governing admissibility of the tape recordings. Unlike the letters, the tape recordings were not adequately authenticated at any part of the trial transcript to which the court's attention has been directed. The tape recordings were said to be of telephone conversations between S.S. and Roger and between S.S. and someone named Dusty. S.S. was not asked to identify the voices on the tape recordings as hers, Roger's, or Dusty's. In addition, it appears that the tape recordings were made without S.S.'s knowledge, in which case adequate authentication would have required some testimony about how, when, and by whom the conversations were recorded.

Although the letters were not admitted into evidence, defense counsel was allowed to question S.S. about the letters and made the jury aware of the general nature of the letters from S.S.'s father. In response to counsel's cross-examination, A.W. admitted her father told her to call 911 if defendant ever tried to discipline her, to cry rape against the defendant, to kick the defendant "in the balls," and that she wanted to live with her father in Pennsylvania. It was error not to admit the letters into evidence, but the error by itself does not amount to reversible error.

Defendant next argues that the allegations made by A.W. and S.S. should not have been tried together because they involved different victims, places, and acts. He contends that the trial court committed reversible error in refusing to sever the counts for separate trials.

Whether a defendant will be tried on separate charges in a single trial is governed by K.S.A. 22-3202(1), which provides: "Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged . . . are of the same or similar character."

The trial court's decision will not be disturbed on appeal absent a clear showing of abuse of discretion. *State v. Barksdale*, 266 Kan. 498, 507, 973 P.2d 165 (1999). Thus, the question for this court is whether no reasonable person would agree with the trial court's decision to try the allegations of A.W. and of S.S. in the same proceeding.

Defendant makes a fairly strong argument that despite the superficial similarities of the charges, they differ substantially in nature. He emphasizes not only the differences in the nature of the sexual acts but also the differences in surrounding circumstances.

Defendant was charged with aggravated incest in the case of A.W., who was his adopted daughter at the time. He adopted her when she was a small child and he was married to A.W.'s mother. A.W. said that defendant abused her when she was 9 years old, shortly after her parents separated and her mother remarried. She was alone with defendant, visiting him in his apartment. He sat with her on the sofa, made her watch "Body Heat" with him, put his hand beneath her clothing to touch her breast and pudendum. Afterward, she left defendant sitting on the sofa and went to bed by herself.

Defendant also was charged with aggravated incest in the case of S.S. Unlike A.W., S.S. was living in the same household with defendant at the time. Her mother was married to the defendant. She had not been adopted by defendant, and she maintained a strong connection with her biological father. S.S. alleged two types of abuse. The first occurred a number of times in the house with no indication that her mother and sister were not at home. She was asleep in bed when defendant got into bed with her and fondled her without placing his hands beneath her bedclothes. In the second, she was with defendant at the photography studio when he made her put a condom on his erect penis, and then she watched while he masturbated to climax.

The counterargument, of course, is that the general similarities of aggravated incest with an adopted daughter and a stepdaughter within a period of several years outweigh the particular differences of the incidents.

In furtherance of his contention that the allegations of A.W. and S.S. should not have been tried together, defendant argues that, under K.S.A. 60-455, evidence of one would not have been admitted in a separate trial of the other. In *State v. Cromwell*, 253 Kan. 495, 512, 856 P.2d 1299 (1993), the court stated that it had "declined to find error when a trial court refused to sever charges that were sufficiently similar such that evidence of one would be admissible under 60-455 in the trial of the other and no prejudice would result to the defendant." Plaskett would have the court hold that it is error when a trial court refuses to sever charges sufficiently dissimilar so that evidence of one would not be admissible under K.S.A. 60-455 in the trial of the other.

Plaskett rather convincingly argues that the "other material facts" named in 60-455 are not at issue. Intent and related facts are not at issue in that defendant denied all allegations. See *State v. Graham*, 244 Kan. 194, 198, 768 P.2d 259 (1989). Preparations, plan, and knowledge are not at issue. Methods of operation have been likened to plan as admissible under K.S.A. 60-455. See *State v. Damewood*, 245 Kan. 676, 681-82, 783 P.2d 1249 (1989). In the present case, the "methods of operation" differ from one allegation to another. Identity and absence of mistake are not issues here.

However, we rejected the same argument made in *Barksdale*, stating:

"[T]his court has not so limited the joinder rule. We have commented that where the evidence of crimes joined for trial would have been admissible under K.S.A. 60-455 in a separate prosecution, the defendant is unable to demonstrate any prejudice when the crimes are tried in a single trial. See *Cromwell*, 253 Kan. at 509-11. At the same time, Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455. See K.S.A. 22-3202(1); *Bagby*, 231 Kan. at 178-79; *Brown*, 181 Kan. at 382-83; *Toelkes*, 139 Kan. at 684." *Barksdale*, 266 Kan. at 509-10.

Although defendant's arguments are not completely lacking in merit, he falls short of showing that no reasonable person would agree with the trial court's refusal to grant separate trials.

Defendant next contends that the jury should have been instructed on the lesser included offense of battery even though the

instruction was not requested at trial. He cites *State v. Riley*, 26 Kan. App. 2d 533, 989 P.2d 792, *rev. denied* 268 Kan. 894 (1999), for the proposition that battery is a lesser included offense of aggravated incest. He contends that the issue's being raised for the first time on appeal should not affect the court's consideration because the error is clearly erroneous.

In *Riley*, the Court of Appeals held that under the circumstances of that case, the trial court's refusal to instruct on aggravated battery as a lesser included offense of attempted first-degree murder was reversible error. 26 Kan. App. 2d at 534-35. *Riley* did not involve a question raised for the first time on appeal. Nor did it involve aggravated incest. Defendant's reliance on *Riley* seems to stem from the Court of Appeals' relying on the second prong of *Fike* as a basis for its decision. In that regard, the Court of Appeals stated: "This may be a case of last impression, since the second prong of the test stated in *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988), has been legislatively overruled. See K.S.A. 1998 Supp. 21-3107(2)(d)." 26 Kan. App. 2d at 534. Because Riley's crimes were committed before the statutory amendment, however, the earlier version of the statute applied.

The offenses in the present case occurred in 1991, 1992, and 1993, well before the legislature amended K.S.A. 21-3107(2)(d). See L. 1998, ch. 185, § 1.

Defendant argues that the evidence required for proving aggravated incest also necessarily proves the offense of battery. The jury was instructed to find the defendant guilty of aggravated incest if he engaged in lewd fondling or touching of the victim or of himself, done with the intent to arouse or satisfy the sexual desires of the victim or of himself. In addition, the jury was required to find that the victim was of a certain age and relationship to the defendant. A charge of battery would be proved by evidence "[t]hat the defendant intentionally caused physical contact with another person in a rude, insulting or angry manner." PIK Crim. 3d 56.16. Defendant argues that the evidence required for proving aggravated incest also necessarily proves intentional physical contact with A.W. and S.S. in a rude, insulting manner.

Here, the crime charged is aggravated incest, and the relation of defendant and the victims is the controlling factor. The factual allegations of the complaint did not require evidence to be adduced at trial that would necessarily prove the lesser crime and do not meet the second prong of the test for battery to be a lesser included offense of aggravated incest. As the court stated in *State v. Gibson*, 246 Kan. 298, 300, 787 P.2d 1176 (1990): "The mere fact that the evidence adduced in proving the crime charged may also prove some other crime does not make the other crime a lesser included offense . . . ." No instruction of battery was required.

Defendant argues that the cumulative trial errors deprived Plaskett of a fair trial.

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

Defendant contends that there were numerous trial errors in addition to those discussed individually in the preceding issues. He urges the court to find that these errors, considered collectively, require reversal of his convictions.

Videotape excerpts. Defendant complains that the State should not have been allowed to select 9 to 10 minutes of the most salacious scenes from "Body Heat," which is a full-length movie, to show to the jury. There was no evidence that defendant selected only parts of the videotape to watch with A.W.

The State concedes that the jury was shown "some of the more explicit scenes from the movie spliced together." The State points out, however, that when defendant objected to the edited version, the trial judge gave him the option to play the entire videotape for the jury, and defendant declined.

Excluded and undiscovered evidence. Defendant contends that he was deprived of a fair trial by the trial judge's exclusion of evidence that was vital to his theory of defense. In addition, he complains of being denied access to records from A.W.'s inpatient records from 1997.

Testimony of Charles Rollins. Defendant asserts that Rollins' testimony was important on the question of A.W.'s reputation for truthfulness as well as to show that A.W. had made false allegations of sexual improprieties against another male. Rollins' testimony was proffered during the trial. He told the court that he was 18 years old at the time of trial (February 1998). He dated A.W. off and on for 6 to 7 months. When he met her she told him she was 15, but she actually was 14 years of age. He denied ever hitting her or having sexual relations with her. He identified a verified motion for a restraining order that had been filed against him alleging physical abuse and nonconsensual sexual relations. Rollins testified that approximately 4 months after the restraining order was issued in April 1997, A.W. telephoned him at work. She apologized to him because the statements in the verified motion were not true. The explanation she gave for signing the motion was that her dad locked her in her room for several days until she agreed to do so. According to Rollins, their conversation continued: "And I was like, Well, all you had to do was just say no. And she was like, Well, I did and I did, and that's the reason why I slit my wrists." In response to the prosecutor's question whether he ever reported the telephone conversation to police, Rollins testified that he had not but instead had gone to the prosecutor's office and spoke with several people about A.W.'s telephoning him at work.

Defense counsel argued to the trial court that defendant ought to be permitted to have the opportunity to present Rollins' testimony "as a false accusation under the *Barber* case." The trial court disagreed. Citing *State v. Barber*, 13 Kan. App. 2d 224, 766 P.2d 1288, *rev. denied* 244 Kan. 739 (1989), and K.S.A. 60-422(d), the trial court stated that the complaining witness in a sex crime case can be cross-examined about prior accusations only after the trial court has made a threshold determination that there is a reasonable probability that the prior accusations were false. After reviewing other instances in which A.W. had told people of prior sexual incidents, including her accusations against Rollins, the trial judge concluded that he could not determine that A.W.'s accusations were false.

On appeal, the State argues that the trial court's ruling was a matter of discretion and that no abuse of discretion has been shown. In particular, the State argues that reasonable persons could agree with the trial court's ruling. We agree.

Videotape of Dominique, the cat. In 1997 or 1998 defendant's wife, Valerie, used their home video camera to show Plaskett and Dominique, the cat, interacting. The videotape, which was marked as defendant's Exhibit 115, was offered for the purpose of rebutting A.W.'s testimony that defendant was physically brutal to her cat as well as to her. Defendant told the trial court that the videotape showed that the cat was not afraid of him and interacted with him. The trial court's expressed reservations about the admissibility of the cat tape centered on the defendant's having been in control of which scenes were videotaped and which were not. In addition, the trial court noted that the videotape was made a number of years after the cat abuse was supposed to have occurred. In response to defense counsel's suggestion that "animals don't forget who's abusive to them," the trial court said that expert testimony would be required on that subject in order to establish the relevance of the videotape. The videotape evidence was properly excluded.

Crittenton records, including the psychiatric evaluation, and A.W.'s letters.

(a) To refute the testimony of A.W. and her mother that A.W. did not tell her mother about defendant's sexually abusing her until November 1994, defendant sought to have admitted defendant's Exhibit 89, the psychiatric evaluation of A.W. done by Dr. Karan at Crittenton on October 1994. The evaluation contains the following paragraph:

"The patient gives a history of having been sexually abused by her previous (adoptive) father from age four to age eight or nine. She said that this happened frequently and always happened when her mother was not around. This continued to happen after the parents separated and she would go to visit the adoptive father. The patient had no contact with this adoptive father at this time and his whereabouts are reportedly unknown. She told her mother about the abuse about a year ago when mother asked her directly if that adoptive father had abused her. She received some counseling for a few sessions but is not sure whether it helped her.

The patient appeared fairly comfortable talking about this issue and did not exhibit any anxiety, dissociative behaviors etc."

The State objected to admission of Exhibit 89 on the ground that it contained "items" that were not relevant. The exhibit was used to refresh Dr. Karan's recollection as she testified at trial, but it was excluded from evidence.

The State, on appeal, points out that Dr. Karan testified that A.W. reported to her that her previous adoptive father sexually abused her from age 4 to age 8 or 9. Through that testimony, the jury learned that there were inconsistencies in A.W.'s accounts of being sexually abused by defendant. The testimony, however, did not serve the purpose of showing inconsistencies between the mother's story and A.W.'s.

Defendant argues that Exhibit 89 bears directly on A.W.'s veracity. He contends that allowing it to be used to refresh a witness' memory does not serve the purpose of allowing the jurors to peruse the records and see for themselves.

(b) A.W. testified that she had believed in ghosts and witches when she was younger, but had stopped believing in them several years before trial. Defendant's Exhibit 81 was identified by A.W. as a letter she wrote to a friend when she was in 7th grade. In the letter, A.W. wrote: "I want to find out EVERYTHING I can about the Occult. I don't care if it takes me twenty years to find what I want. I'm going to become a REAL witch. I want to learn how to use Powers."

The trial court questioned the relevance of defendant's Exhibit 81 and refused to admit it. Defense counsel explained to the court that in defendant's view the evidence was relevant to show that A.W. had a vivid imagination and that she did not restrict her thinking to verifiable facts. Although not allowed to show defendant's Exhibit 81 to the jury, defense counsel was allowed to ask A.W. whether she ever told anyone she wanted to become a witch and wanted to use powers. A.W. answered in the affirmative. Asked what kind of powers she had in mind, A.W. said: "I was kind of referring to a religion called wicca . . . . [a]nd to be able to tell fortunes and stuff like that." She testified that she had at one time had an interest in tarot cards, stones and crystals.

Change of Judge. On May 29, 1997, nearly a year before trial, defendant filed a motion for change of judge pursuant to K.S.A. 20-311d. The grounds for the motion, as stated in the accompanying affidavit of Plaskett, were that statements made by the trial judge's administrative assistant revealed bias, which may reflect the judge's opinion of the defendant. Another affidavit attached to the motion was made by Jay Norton, a lawyer from defense counsel's office, who overheard Judge Tatum's administrative assistant discussing the case with the prosecuting attorney. The affiant stated that the administrative assistant, referring to dismissal of prior charges, told the prosecutor that she was " 'just sad that this guy was going to be walking the street' some more." The affiant also stated that the administrative assistant and the prosecutor discussed how many stupid defense motions had been filed in the case.

The motion for change of judge was considered and denied by another Johnson County District Court Judge. He concluded: "[T]he incidents described in the Affidavits, if true, were ill-advised and unfortunate, but do not mandate a change of judge pursuant to K.S.A. 20-311d(c)(5), merely because a court staff person was involved." On appeal, the State points out that Judge Tatum now has a different administrative assistant.

Denied discovery of Norma's therapy records. The trial court denied defendant's discovery motion seeking production of records for Norma's treatment by various mental health professionals. The trial court stated that he was aware of no legal basis for production of the records, and he viewed the request as a fishing expedition. No legal basis has been suggested to this court, either.

Voir dire procedures.

(1) Defendant's access to juror questionnaires. Defendant complains that he was prevented from personally reviewing the juror questionnaires. He claims that, as a result, he was prevented from exercising his challenges in an intelligent, informed manner.

The State points out that defense counsel reviewed the juror questionnaires, and that defendant was present for the day-long jury selection. The State's argument is that defendant had no right to see the juror questionnaires. The State cites an Ohio case for

the proposition that the use of peremptory challenges is a matter of trial strategy. *State v. McNeill*, 83 Ohio St. 3d 438, 449, 700 N.E.2d 596 (1998). Peremptory challenges are basically counsel's prerogative; however, the jury questionnaires are available, or should be, through his counsel. It is a matter to be left to defense counsel, and there is no claim the questionnaires were not made available to defense counsel or resulted in prejudice to the defendant in selecting the jury.

Neither party indicates that there is a copy of the juror questionnaire in the record.

(2) <u>Individual voir dire</u>. During voir dire, a venireperson stated that she believed defendant was guilty because he had been accused by more than one person of childhood sexual abuse. After that venireperson had been excused for cause, defense counsel requested that counsel for both parties be allowed "to have individual voir dire of these prospective jurors in order to avoid what just happened here with her making a statement that I think is extremely prejudicial to Mr. Plaskett." The trial judge responded:

"That will be denied. Her comments were not specific based on any knowledge of the case. Her comments were only that based on allegations. And at this point in time I don't find that's a basis for individual voir dire, nor for a finding that extreme prejudice has occurred to the defendant, so it will be overruled."

Defendant complains that statements revealing bias were made by three other venirepersons after the one was excused for cause and that examination of the comments will show the problem of contamination of the panel during voir dire. Examination of the comments reveals venirepersons viewing the charges against defendant through the lens of personal experience. One said:

"My judgment's colored only by the fact that I have a 12-year-old daughter, which is why I'm more attuned to those things when they're out in the media. And I don't know, it does affect me. I would try and be open and weigh the facts, but it does affect me inside. It bothers me."

Another venireperson commented: "My brother-in-law was convicted of molesting children. That was about ten years ago, before I knew him. And probably almost three years ago he was accused but never—the charges were never filed." Asked if she could be

fair and impartial, she answered, "I think so." The third venire-person singled out by defendant commented: "I had a friend whose son was convicted of child molestation I believe four years ago, three, four years ago. And I have no involvement in it. She's just a friend." She expressed concern that she "could maybe be a little biased," but ultimately assured the prosecutor that she would do her best to be fair and impartial.

On appeal, defendant cites *State v. Lumbrera*, 252 Kan. 54. The defendant in that case was a mother accused of killing her young child. Many of the prospective jurors had read newspaper stories stating that five other children of the defendant died when very young, some of similar causes, and that investigations into their deaths were being reopened in another state. The court's opinion contains this account of voir dire:

> "A number of prospective jurors discussed the facts disseminated as to the other children and expressed the opinion there were just too many deaths to be a matter of coincidence and felt they could not be impartial.
>
> . . . .
>
> "The trial court knew that little evidence relative to the deaths of the other children would be introduced because of its own prior ruling on the motion in limine filed herein. Discussions by prospective jurors of these 'facts' and their opinions thereon was rendered all the more prejudicial in such circumstances.
>
> "We find no abuse of discretion in the trial court's decision to commence voir dire in the manner it did, but conclude that it should have modified the procedure when the risk of contamination through juror comments became a reality rather than just a possibility proposed by defense counsel. Examination of the milieu in which the voir dire was conducted convinces us that defendant's right to be tried by an impartial jury was jeopardized by the voir dire procedure utilized herein." 252 Kan. at 60-61.

In *Lumbrera*, extensive pretrial publicity set the stage for the problematic voir dire procedure. Inadmissible evidence and bias based on it was openly discussed. Pretrial notoriety was not a factor in the present case. Defendant seems to contend, instead, that the nature of the crimes, in particular the multiple allegations, stirs strong emotions that threaten to contaminate an open voir dire procedure. We do not find that to be the case in the present case.

(3) Failure to excuse for cause. Defendant complains of the trial court's refusal to excuse for cause two venirepersons. The first said

that, when younger, she and her sister had been inappropriately touched by a friend and more recently she had been falsely accused of sexual harassment of a college student. The court refused to strike her for cause. The second was a mental health professional, a private practice therapist. She had worked with clients with sexual abuse issues and had testified at least four times as an expert witness in trial courts. Asked what her role would be in jury deliberations, she responded: "I think if I had an opinion one way or the other about this case, it would behoove me to explain how I came to that decision for myself. Whether they use that to influence their own decision, I don't know." Defense counsel asked other venirepersons whether her expertise would influence their deliberations, and several believed that she would affect the outcome. Another thought that he would seek her counsel if he was undecided. The court refused to strike her for cause.

In *State v. Donesay*, 270 Kan. 720, 19 P.3d 779 (2001), defendant claimed that the trial court's refusing to excuse a prospective juror violated his right to due process. The court said that the issue had been resolved in *United States v. Martinez-Salazar*, 528 U.S. 304, 307, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000), where the Supreme Court held " 'that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any . . . constitutional right.' " 270 Kan. at 726.

In the present case, defendant has not supplied information about which venirepersons were eliminated by peremptory challenges. Examination of the transcript of voir dire, however, shows that neither of the venirepersons complained of remained when the 12 jurors were named. Thus, *Donesay* governs defendant's claim that the process was unfair.

Violation of the ruling on a motion in limine. Defendant complains that the prosecutor violated the ruling on his motion in limine twice during opening statements by referring to the complaining witnesses as "victims." Right out of the gate, the prosecutor stated: "In 1983, Norma [W.], the mother of [A.W.], the first victim, married Dan Plaskett, our defendant." Within a short time, the prosecutor describes Valerie as "the mother of our second vic-

tim, [S.S.]" Defense counsel objected: "Objection, Your Honor. There's been an order by the Court regarding something Mr. Hymer just said, and I want to remind Mr. Hymer of that." The trial judge asked counsel to approach the bench, where defense counsel continued: "The Court made a order in limine that counsel is not to refer to the alleged victims as 'victims,' and I believe he's done it three times now, both to [A.W. and S.S.] It's prejudicial and violative of the Court's order, and I'd ask the Court to admonish Mr. Hymer not to use that word." The trial judge instructed the prosecutor to "[j]ust refer to them by name." That was the end of the complained of violation of the pretrial order.

Defendant relies on *State v. Massey*, 242 Kan. 252, 747 P.2d 802 (1987), for his contention that the prosecutor's remarks in opening statement constituted reversible error. In *Massey*, the court stated that the prosecutor's *prejudicial* violation of an order in limine issued in a criminal trial is reversible error. 242 Kan. 252, Syl. ¶ 5. In *Massey*, an order in limine prohibited the State's witnesses from giving opinions that the untested hole in the bedspread covering the victim's dead body was caused by a bullet. Whether the hole was caused by a bullet was an issue of considerable significance to the defense theory. One of the detectives testified that "[i]t appeared to be a bullet hole through the bedspread." 242 Kan. at 263. The trial court denied defendant's motion for mistrial. This court concluded that the violation of the order in limine prejudiced the defendant, and the judgment was reversed. 242 Kan. at 265.

In the present case, there was no motion for mistrial. If there had been a motion for mistrial, defendant would still have the chore of showing that the prosecutor's two references to the complaining witnesses prejudiced him. No such showing has been made.

The cumulative effect of the errors in this case did substantially prejudice the defendant and denied him a fair trial. Especially troublesome is the trial court's refusal to allow evidence impeaching A.W. and her mother. Even more troublesome is the testimony of Detective Langer. As previously noted, we have held the admission of similar testimony to be reversible error. In *Jackson*, we held that allowing SRS investigators to testify that in their opinion the victim was telling the truth was reversible error. Whereas cases like *Mul-*

*lins*, where we held the error to be harmless, are factually distinguishable from the present case. Our holding in *Jackson* is controlling here. Even if it were not, the cumulative effect of the trial errors would require that we reverse the conviction as to A.W. The evidence in the present case is not overwhelming. It boils down to A.W.'s word against the defendant's. For that reason, the prejudicial effect of not allowing the evidence impeaching A.W. and allowing Langer's testimony is obvious and substantial.

It is a closer call in regard to the charges of aggravated incest with S.S. Standing alone, the cumulative effect of the trial errors involving the charges as to S.S. do not rise to the level which denied the defendant a fair trial. However, we must view the charges involving S.S. in the context in which they were tried, jointly with the charge involving A.W.

The State controls how a case will be prosecuted. Joinder of the charges for trial resulted from the State charging the three counts in one complaint. Although the trial court's denying the defendant's motion to sever the charges was not error, it benefited the State in prosecuting the case. Therefore, the State must also bear the effect its errors have on all the charges which are joined for trial. Here, errors directly affecting the fairness of the trial as to A.W. likewise had the same indirect effect as to S.S. To conclude otherwise ignores the reality of the consequences which might have resulted from joining the charges in the present case.

As noted above, this is a case which boils down to the word of the two girls against the defendant. The credibility of their testimony is the State's case. The effect of not allowing evidence impeaching the credibility of A.W., and allowing Detective Langer's testimony vouching for her credibility, necessarily bolsters the credibility of S.S. and the case against the defendant. Those trial errors, when taken together with the trial court's restricting the evidence to impeach S.S., have the cumulative effect in this case of substantially prejudicing the defendant and denying him a fair trial on the charges involving S.S.

The defendant also argues that his sentence is illegal and he must be resentenced. The State agrees with defendant's contention that the 4-and 5-year minimum sentences that the trial court imposed

exceeded the statutory minimum. A sentence for a term of imprisonment that does not conform to the statutory authorization is an illegal sentence. *State v. Ruff*, 252 Kan. 625, 628, 847 P.2d 1258 (1993). However, since we reverse the convictions, this issue is moot.

The defendant's convictions of aggravated incest are reversed, and the case is remanded for a new trial.