No. 120,584

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL J. KLAVETTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

When questionnaires of prospective jurors are made available to defense counsel, the decision whether to allow the defendant to personally review those questionnaires is a matter of strategy entrusted to the defense attorney.

2.

A defendant in a criminal case has a right to be present during every critical stage of the proceedings. This right emanates from the right to confront witnesses under the Sixth Amendment to the United States Constitution and from the right to due process guaranteed under the Fifth and Fourteenth Amendments.

3.

When there has been a violation of the defendant's right to be present at critical stages of the proceedings, the State must demonstrate that the violation was harmless beyond a reasonable doubt. Under this constitutional harmless-error standard, courts may only declare an error harmless when the State convinces us that there is no reasonable possibility that the error contributed to the verdict in light of the entire record.

1

4.

Under K.S.A. 2020 Supp. 21-6627, commonly known as Jessica's Law, a court must impose a sentence of life imprisonment for certain charges, including aggravated indecent liberties with a child, unless mitigating factors give rise to substantial and compelling reasons to depart from this directive.

5.

The identification of potentially mitigating circumstances does not impel a finding that those circumstances are substantial and compelling reasons to depart from the presumptive sentence under Jessica's Law. Instead, a district court must assess the specific facts of case before it and determine whether these circumstances are sufficiently substantial and compelling to depart from the presumptive sentence of life imprisonment.

6.

K.S.A. 2020 Supp. 21-6601 states general policy aims concerning sentencing, while more specific directives are included throughout the Kansas sentencing statutes.

7.

The legislature's policy aims in K.S.A. 2020 Supp. 21-6601 are incorporated into the Jessica's Law sentencing framework. By permitting a court to impose a lesser sentence when mitigating circumstances give rise to substantial and compelling reasons for a departure, the Jessica's Law sentencing framework recognizes—consistent with K.S.A. 2020 Supp. 21-6601—that a case's unique circumstances may warrant a more lenient sentence.

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed August 6, 2021. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., WARNER and HURST, JJ.

WARNER, J.: Daniel Klavetter was convicted of two counts of aggravated indecent liberties with a child, off-grid person felonies, for interactions involving his fiancé's two daughters. He now appeals, challenging various aspects of the jury-selection proceedings during his trial. Klavetter also argues the district court abused its discretion when it denied his request for a departure from the presumptive sentence of life imprisonment. After carefully considering the record and the parties' arguments, we affirm Klavetter's convictions and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

Klavetter met his fiancé (who we refer to in this opinion as Mother) at her family's Thanksgiving dinner in 2015. At the time, Klavetter lived with Mother's sister and brother-in-law in Olathe. He and the brother-in-law had been best friends since childhood, and Klavetter was well liked by the family.

Mother lived in Emporia with her 11- and 12-year-old daughters. (Because both daughters have the same initials, we refer to them as the "older daughter" and "younger daughter.") Mother began dating Klavetter soon after the Thanksgiving holiday. Klavetter would visit the family in Emporia every week on his days off.

Initially, Mother was happy in the relationship and excited for her daughters to have a positive male role model, and potentially even a father figure, in their lives. Klavetter appeared to be forging a close relationship with the girls, helping Mother put them to sleep and spending time with them whenever he was around. Mother trusted

Klavetter enough to leave him alone with her daughters, and she thought they were all getting "along wonderfully."

As time went on, however, this relationship changed. Mother grew somewhat concerned when she learned Klavetter had been spending time in the girls' bedroom when she was not around. Mother later noted that this behavior raised a "red flag," but at the time she "really wasn't sure . . . what to really make of it." And Mother's older daughter confessed to Mother that although she had been comfortable around Klavetter at first, she no longer liked him.

Despite any misgivings, in the summer of 2016, Mother and the daughters moved into a two-bedroom apartment with Klavetter in Olathe. Mother and Klavetter became engaged shortly thereafter.

Later that same summer, Mother's older daughter attended a church camp in Wisconsin. When she came home from her trip, she felt sick from the long car ride and went to bed early. Some hours later, she woke to find Klavetter lying in her bunkbed and touching her; he had one hand on her bra and one hand down her pants, touching her vagina. The older daughter was terrified and felt frozen, but she managed to pull away from Klavetter and locked herself in the bathroom, waiting until he left to return to bed.

The next morning, the older daughter told Mother that "something really bad had happened." Mother confronted Klavetter after the daughter revealed what he had done. Klavetter admitted that he had gotten into the bunkbed and "dozed off" while lying next to the older daughter, and that he woke up when she turned the bathroom light on. But Klavetter claimed he did not remember touching her and said that he must have thought he was in bed with Mother. He later told another family member that he "probably did it"—meaning, touched the daughter inappropriately—but "just [didn't] remember."

4

Klavetter continued to live at the apartment after the incident with the older daughter because Mother thought they "could work through [it] as a family." But about two weeks later, Mother's younger daughter revealed that Klavetter had also touched her inappropriately. The younger daughter told Mother that Klavetter would frequently put his hand down the back of her pants when he hugged her. And she described an incident that had occurred soon after they had moved into the Olathe apartment—about a month before Klavetter had touched the older daughter—when Klavetter had put his hands down the back of her sweatpants, inside her underwear, while they were lying on the couch watching TV. The younger daughter said she had kept quiet even after her sister had come forward because Mother seemed to be happy with Klavetter and the younger daughter did not want to "mess that up." Klavetter denied touching the younger daughter, but Mother immediately told Klavetter to move out of the house.

Mother and the two daughters began attending counseling, which led to the Department for Children and Families investigating the matter. After several months and multiple interviews with social workers and detectives, the State charged Klavetter with two counts of aggravated indecent liberties with a child.

The case against Klavetter proceeded to trial, and a jury found him guilty of both charges. These convictions each carry a presumptive sentence of life imprisonment with no possibility of parole for 25 years. See K.S.A. 2020 Supp. 21-5506(b)(3); K.S.A. 2020 Supp. 21-6627(a)(1)(C).

At sentencing, Klavetter requested a durational departure, arguing he did not have any previous criminal record. He also argued that the degree of harm in these offenses was lower than typical aggravated indecent-liberties cases. The district court found Klavetter failed to show substantial and compelling reasons warranting a departure. The court therefore imposed two life sentences for his offenses, with a mandatory minimum of 25 years' imprisonment before eligibility for parole, to be run consecutively.

DISCUSSION

In his appeal, Klavetter challenges various aspects of the proceedings that led to his convictions and sentence. He claims that three events during jury selection violated his constitutional rights to a jury trial and to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution. He also claims the district court abused its discretion at sentencing when it denied his request for a dispositional departure. We first address Klavetter's jury-selection challenges and then turn to his sentencing arguments.

1. *The jury-selection proceedings during Klavetter's trial were fair.*

Klavetter challenges several actions during jury selection at his trial. He asserts that he was denied a trial by his peers when the questionnaires of potential jurors were provided to his attorney but not him personally. He also asserts that the prosecutor erred when the prosecutor stressed that it was the jury's role to assess guilt, not to consider punishment. Finally, he asserts his rights were violated when bench conferences with various prospective jurors—all of whom were eventually removed from the jury pool— were held outside his presence.

As our discussion below explains, we do not find these arguments persuasive. Kansas caselaw demonstrates that Klavetter's first two claims of error, involving the questionnaires and the prosecutor's comments, are without merit. With regard to his third claim, Kansas courts have not squarely decided whether a defendant in a criminal case has a right to be present during sidebar discussions with prospective jurors. But even assuming Klavetter had a right to be present during these conversations, he has not shown that his exclusion from these discussions violated his rights, as all the prospective jurors involved were removed from the jury pool for cause or by peremptory strike.

1.1. *Klavetter's constitutional right to a jury trial was not violated when his counsel—but not Klavetter personally—received and reviewed the questionnaires from prospective jurors.*

Klavetter argues that the jury-selection proceedings violated his constitutional rights under the Sixth Amendment to the United States Constitution because he was not able to personally review the questionnaires submitted by prospective jurors during voir dire. Klavetter acknowledges that his counsel received these questionnaires and had the opportunity to review them. But he asserts that his counsel's decision not to share the questionnaires with him violated his constitutional right to be tried by a jury of his peers.

The Sixth Amendment secures the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community—or as Klavetter puts it, "an impartial jury of his peers." See *Berghuis v. Smith*, 559 U.S. 314, 319, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010). Typically, a challenge brought under this section arises when members of a particular group are excluded from serving on a jury. See *Durren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979) (requiring showing of underrepresentation "due to systematic exclusion of the group in the jury-selection process"); cf. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (exercising a peremptory challenge against a prospective juror based solely on that person's race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution). Klavetter does not argue that any person or distinctive group of persons was excluded from the jury. Instead, he asserts that because he personally was not given the opportunity to review the juror questionnaires, there was no way for him to know "if possible jurors were 'peers' or not."

Our Kansas Supreme Court considered a similar argument to the one Klavetter raises in *State v. Plaskett*, 271 Kan. 995, 1027, 27 P.3d 890 (2001). The *Plaskett* court found no violation of the defendant's rights when juror questionnaires were supplied to defense counsel. The court observed that the decision to provide the defendant a copy of

7

the questionnaires is a matter of strategy "to be left to defense counsel." 271 Kan. at 1027. Because, as here, there was "no claim the questionnaires were not made available to defense counsel or resulted in prejudice to the defendant in selecting the jury," the court found no error. 271 Kan. at 1027.

As in *Plaskett*, Klavetter was present during voir dire, and his counsel reviewed the juror questionnaires before exercising peremptory challenges and passing the jury panel. Klavetter has not shown that his Sixth Amendment right to a jury trial was compromised when his counsel chose not to provide those questionnaires for him to personally review.

1.2.    *The prosecutor did not err when he reiterated during voir dire that it is the jury's role to assess guilt, not to address sentencing.*

Klavetter also claims that the prosecutor made certain comments during voir dire that were aimed at eroding the State's burden of proof and thus denied him a fair trial. As a preliminary matter, the State points out that Klavetter did not object to the prosecutor's statements during jury selection. Yet claims of prosecutorial error are not subject to K.S.A. 60-404's contemporaneous-objection requirement. See *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018); *State v. Crawford*, 300 Kan. 740, 744, 334 P.3d 311 (2014). The presence or absence of a contemporaneous objection may factor into an appellate court's analysis of whether an error has occurred and if that error requires reversal. But it does not preclude appellate review of those claims. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017).

Appellate courts review allegations that a prosecutor erred when addressing the jury using a two-step analysis. First, we must determine if the challenged comments fell outside the wide latitude prosecutors are permitted in conducting the State's case. *State v. Chandler*, 307 Kan. 657, Syl. ¶ 6, 414 P.3d 713 (2018). If the prosecutor erred, we then determine if that error compels reversal, using the harmlessness inquiry for errors of

constitutional magnitude in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Though defendants typically raise claims of prosecutorial error arising in opening statements or closing arguments, these same standards apply when the challenged conduct occurred during jury selection. *State v. Simmons*, 292 Kan. 406, 411-12, 254 P.3d 97 (2011).

During jury selection in Klavetter's case, the prosecutor addressed the venire members and emphasized that it was the role of the jury to assess guilt, not to address or be influenced by sentencing concerns. The prosecutor explained:

> "The jury's job, as we have spoken about, is to decide whether the evidence proves that Mr. Klavetter is guilty or it doesn't.
>
> "If he's convicted, it will be up to [the court] what happens to him, what penalty, if any penalty, that he suffers.
>
> "The juries in Kansas don't have an opportunity to weigh in on the penalty, except in death penalty cases.
>
> "Obviously, this is not a murder case or a death penalty case.
>
> "Is that all right with you?
>
> "I ask that because I can tell you from personal experience from a case I had before. It was a criminal possession of a firearm. So nothing relating to anything like this.
>
> "We had a trial, and the jury found the guy not guilty. I was kind of stunned, but I thought it was a pretty good case, but I told you we have an opportunity to speak with them afterwards, . . . and somebody in the jury says, 'What if he's convicted? That's an automatic five years in prison.' Not true. Not in the State of Kansas.
>
> "So the jury actually told me they thought he was guilty, but didn't think the case was worth five years in prison. So they found him not guilty.
>
> ". . . The point is, the penalty is not your concern. Your concern is to judge the credibility of evidence and decide if you are convinced beyond a reasonable doubt that Mr. Klavetter did the things he's accused of doing.
>
> "If you do decide that [he is guilty], the penalty is up to the Judge.
>
> "Can everybody do that? All right."

Klavetter argues the prosecutor's comments contained two errors that deprived him of a fair trial. First, by telling the jury that his case did not involve the death penalty, Klavetter asserts the State injected sentencing considerations into the trial through discussing "what type of penalty [he] *did not* face if convicted." Second, by stating that the ultimate sentence "if any" would be determined by the court, Klavetter claims the prosecutor misled the jury to believe that there was a possibility he could receive no sentence, even if he were found guilty. We find neither argument convincing.

As to Klavetter's first argument, it is true that juries should not be concerned with, or informed about, the potential penalty a defendant faces but rather with the fundamental question of his or her guilt. *State v. Lowery*, 308 Kan. 1183, 1229, 427 P.3d 865 (2018); see also PIK Crim. 4th 50.080 (2015 Supp.) ("Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is not to be considered in arriving at your verdict."). But the prosecutor's comment that the death penalty was inapplicable did not encourage the jury to consider Klavetter's punishment. Rather, it underscored that the jury's duty is solely to assess guilt.

The Kansas Supreme Court recently addressed a similar situation in *State v. Blevins*, 313 Kan. 413, 485 P.3d 1175 (2021). In *Blevins*, the district court—in response to a question from the jury pool—informed the prospective jurors that the trial was "'not a capital punishment case.'" 313 Kan. at 423. The *Blevins* court held that the comment was factually accurate and did not dilute the State's burden of proof because the statement "kept the jury focused on the evidence, not on the potential for a punishment that at least one potential juror found morally objectionable." 313 Kan. at 425. And the *Blevins* court found that "the mere observation that the death penalty is inapplicable in a particular case does not imply that the defendant's potential sentence, if convicted, would be light." 313 Kan. at 425.

10

We likewise find no error in the prosecutor's passing reference here to the fact that this case does not involve the death penalty. Considering his comment in context, the prosecutor was not attempting to inform the jury about the ultimate penalty Klavetter did or did not face. Instead, he was making a broader point that the jury could not concern itself with *any* potential penalties Klavetter might receive. This statement was both accurate and within the permissible scope of discussion during jury selection.

Klavetter's second argument—that the prosecutor's statements misled the prospective jurors by implying Klavetter might not receive any sentence, if found guilty—is similarly unconvincing. Again, Klavetter's argument isolates a single portion of the prosecutor's comment and analyzes it out of context. The prosecutor was merely reiterating the fact that the jury was not to consider Klavetter's potential sentence, whatever that sentence may be. And as the State points out in its brief, the prosecutor's statement about the court's authority to decide Klavetter's sentence was not a misstatement of the law, as a court has the power to vacate a jury's verdict by granting a motion for judgment of acquittal. See K.S.A. 22-3419(3) ("If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal."). While this aside may have been unnecessary to make the prosecutor's point, the prosecutor's comments were not error.

When taken in context, the prosecutor's statements were not misstatements of the law and did not alter the State's burden. Nor did these comments encourage the jury to consider punishment while determining Klavetter's guilt; in fact, they were aimed at informing the jury that it could not do so. The prosecutor's comments during jury selection were within the wide latitude granted to parties arguing their respective positions. Klavetter has not apprised us of error.

1.3.    *Any error in questioning individual venire members outside Klavetter's presence was harmless.*

In his final argument concerning his trial, Klavetter claims his procedural due-process rights were violated when the district court held bench conferences outside his presence during jury selection. These conferences occurred because several venire members expressed discomfort in answering certain questions in open court due to their personal experiences with and beliefs about sexual abuse.

Some additional background provides context for this discussion. During voir dire, several venire members requested to speak to the court privately due to the sensitive nature of some of the screening questions:

- When the prosecutor asked whether any prospective jurors had children who still lived at home, one refused to answer in open court. The court called a conference to speak with the person in the jury room, outside the presence of the rest of the panel. Though the prosecutor and Klavetter's defense attorney participated in the brief conference, Klavetter was not present. During the conference, the prospective juror explained that he did not want to give out any personal information about his family due to the nature of the charges against Klavetter. He also stated that he could not be impartial because he had a young daughter. After Klavetter's attorney questioned the man, the court excused him for cause.

- Two other prospective jurors then relayed similar concerns about speaking in open court. Again, a conference was held with each juror outside the courtroom where the attorneys, but not Klavetter, were present. One potential juror was a victim of a sex crime and expressed concerns with being impartial. The other explained that he could not be objective due to a personal belief that the judicial system did not adequately protect the public from pedophiles. The court excused both potential jurors for cause with the consent of both counsel.

- Later in the process, another prospective juror asked to speak to the court privately. In a conference with the court and the attorneys, but not the defendant, this person explained he had been a victim of sexual abuse and did not feel that he could be impartial during Klavetter's trial. He was also excused for cause.

- A final prospective juror requested to speak outside the presence of the other venire members. The court once more held a conference with the prospective juror, the prosecutor, and the defense attorney. The venire member explained that someone had attempted to sexually assault him as a child, though he stated that he believed he could still be impartial if selected. After this discussion, this juror was not excused for cause. But he was later removed from the jury pool via a peremptory strike.

Klavetter did not object to his exclusion from these conferences at trial. He now argues, however, that conducting these discussions in his absence denied him the fundamental right to be present at all critical stages in his trial.

Constitutional claims cannot generally be raised for the first time on appeal. A defendant seeking to raise an issue for the first time on appeal must affirmatively assert—and convince the court—that an exception to this preservation rule warrants our consideration of the defendant's argument. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018); see Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 36) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."). Klavetter asserts that consideration of the claim is necessary to prevent the denial of his fundamental right to a fair trial. See *State v. Dunn*, 304 Kan. 773, 819, 375 P.3d 332 (2016). And the question whether a defendant was denied his or her right to be present is a legal question, which, when properly presented, we review de novo. See *Lowery*, 308 Kan. at 1212. Based on these assertions, and because Klavetter has

sufficiently demonstrated that the record in this case allows for meaningful review, we determine that the lack of an objection does not prevent us from considering the merits of Klavetter's claim.

A defendant in a criminal case has a right to be present during every critical stage of the proceedings. *State v. Bolze-Sann*, 302 Kan. 198, 215, 352 P.3d 511 (2015). This right "emanates from the Sixth Amendment right to confront witnesses and from the right to due process guaranteed under the Fifth and Fourteenth Amendments." *State v. Davis*, 284 Kan. 728, 731, 163 P.3d 1224 (2007). K.S.A. 2020 Supp. 22-3405(a) codifies the same rights and "'is analytically and functionally identical'" to the requirements under the federal Constitution. *State v. Killings*, 301 Kan. 214, 241, 340 P.3d 1186 (2015).

A defendant's right to be present is not absolute, however. The scope of that right is "'influenced by circumstances and context.'" *State v. McDaniel*, 306 Kan. 595, 601, 395 P.3d 429 (2017). It does not extend to proceedings where the defendant's presence "'would be useless, or the benefit but a shadow.'" *Lowery*, 308 Kan. at 1213.

The Kansas Supreme Court has attempted to provide guidance on this contextual line-drawing, indicating that a critical stage of the proceedings includes "'any stage of the trial when the jury is in the courtroom or when the defendant's presence is essential to a fair and just determination of a substantial issue.'" *Lowery*, 308 Kan. at 1213. Thus, generally speaking, a defendant must be present at "all times when the jury is present in the courtroom and whenever the court communicates with the jury." *State v. Garcia*, 233 Kan. 589, Syl. ¶ 2, 664 P.2d 1343 (1983).

The scope of a defendant's right to be present is less clear before the jury is empaneled. The Kansas Supreme Court observed in *State v. Lopez*, 271 Kan. 119, 130, 22 P.3d 1040 (2001), that it was aware of no instances where defendants were found to have a right to be present to "proceedings preliminary to voir dire and conducted in chambers."

14

For this reason, it found that meetings involving the "[s]creening of questionnaires for the purpose of identifying potential jurors to be placed on the venire list" was not a critical stage requiring the defendant's presence. 271 Kan. at 130. In *State v. Thurber*, 308 Kan. 140, 212, 420 P.3d 389 (2018), the court noted that an "in-chambers discussion about an ill juror's dismissal prior to opening statements" had "some markings of a critical stage." In *Thurber*, the court assumed—without deciding—that the defendant should have been present in those circumstances, though it ultimately found his absence to be harmless. 308 Kan. at 213.

There is no need to determine in this case whether the exclusion of Klavetter from the sensitive discussions with the various potential jurors during voir dire was a critical stage in the proceeding because Klavetter's claim fails for another reason. Even if we presume that Klavetter should have been present during these discussions, as the court assumed in *Thurber*, the State has persuaded us that this error did not affect the outcome of the proceedings.

In instances where "there has been a violation of the defendant's right to be present," the State must demonstrate that the violation was harmless beyond a reasonable doubt. *Davis*, 284 Kan. at 732. Under this constitutional harmless-error standard, we may only declare an error harmless when the State convinces us that there is no reasonable possibility that the error contributed to the verdict in light of the entire record. *Bolze-Sann*, 302 Kan. at 216. The State has made this showing. All the potential jurors who were involved in the conferences with the court outside Klavetter's presence were removed from the jury pool, either for cause or by way of a peremptory strike. We note that Klavetter has not argued that any of these people should have remained in the venire—indeed, all expressed doubts that they could remain impartial given the charges in this case. Under these circumstances, we are confident that these conferences did not affect the outcome of Klavetter's trial.

Klavetter has not demonstrated that any action during jury selection deprived him of a fair trial. Nor does he seek our review of any other aspect of his jury trial or verdict. We therefore affirm Klavetter's two convictions of aggravated indecent liberties with a child and turn to his sentencing challenges.

2. *The court did not err when it denied Klavetter's request for a durational departure at sentencing.*

Under K.S.A. 2020 Supp. 21-6627—commonly known as Jessica's Law—a court must impose a sentence of life imprisonment for certain charges, including aggravated indecent liberties with a child, unless mitigating factors give rise to substantial and compelling reasons to depart from this directive. See K.S.A. 2020 Supp. 21-6627(d)(1). Appellate courts review a district court's assessment as to whether mitigating factors justify a departure for an abuse of discretion. *State v. Atkisson*, 308 Kan. 919, Syl. ¶ 3, 425 P.3d 334 (2018). A court abuses its discretion when no reasonable person would agree with the court's decision or when the decision is based on a mistake of fact or law. 308 Kan. 919, Syl. ¶ 4.

Each of Klavetter's convictions for aggravated indecent liberties with a child was an off-grid felony carrying a presumed life sentence with no possibility of parole for 25 years. See K.S.A. 2020 Supp. 21-5506(b)(3); K.S.A. 2020 Supp. 21-6627(a)(1)(C). As we have noted, Klavetter requested a durational departure sentence, pointing out that he did not have a previous criminal record and arguing that the harm caused by his actions was lower than in "typical" aggravated indecent-liberties cases. The district court found that the reasons Klavetter offered did not warrant a departure and denied his motion. The court then imposed two sentences of life imprisonment, to be served consecutively, with a minimum of 25 years' imprisonment before Klavetter would be eligible for parole.

Klavetter argues the district court committed two errors during sentencing when it denied his request for a durational departure. He asserts that the court did not sufficiently

analyze whether the mitigating circumstances he raised in this case warranted a departure from the presumptive sentence of life imprisonment. And he argues that, in imposing consecutive sentences of life imprisonment, the court failed to consider the broader policy goals involved in Kansas sentencing statutes. For the reasons we explain here, we find no error and affirm Klavetter's sentence.

Klavetter first argues the district court abused its discretion when it denied his request for a departure. He asserts that the harm caused by his offenses was less severe than many cases involving crimes of aggravated indecent liberties against children, and the court's comments during sentencing suggested that it did not believe the severity of the defendant's conduct could ever serve as a mitigating factor in a Jessica's Law case. He also argues that the district court should have granted a departure based on his criminal history since it was undisputed. We disagree.

In K.S.A. 2020 Supp. 21-6627(d)(2), the Kansas Legislature provided a nonexclusive list circumstances that might justify a departure sentence. K.S.A. 2020 Supp. 21-6627(d)(2)(A) identifies a defendant's criminal history as a mitigating circumstance that a court may consider. While the degree of harm caused by the defendant's actions is not included in K.S.A. 2020 Supp. 21-6627(d)(2)'s list, the absence of that factor does not preclude a court from considering whether the severity of the offense justifies a departure sentence—particularly when the legislature included the degree of harm caused by the offense as a potential mitigating factor for all presumptive sentences under K.S.A. 2020 Supp. 21-6815(c)(1)(E).

But the identification of potentially mitigating circumstances at sentencing does not impel a finding that those circumstances are substantial and compelling reasons to depart from a presumptive sentence. Instead, the district court was required to assess, under the specific facts of Klavetter's case, whether these circumstances were sufficiently substantial and compelling to depart from the presumptive sentence of life imprisonment.

17

See *State v. Powell*, 308 Kan. 895, 915, 425 P.3d 309 (2018); see also *State v. Jolly*, 301 Kan 313, 323, 342 P.3d 935 (2015) ("though mitigating circumstances must be present for a finding of substantial and compelling reasons, mitigating circumstances do not necessarily equal substantial and compelling reasons"). A potentially mitigating circumstance is substantial when it is "'real, not imagined,'"—"'something with substance and not ephemeral.'" 301 Kan at 323. A substantial circumstance is a compelling reason for departing from a presumptive sentence when "'the court is forced, by the facts of a case, to leave the status quo or go beyond what is ordinary.'" 301 Kan. at 326.

At sentencing, Klavetter's attorney argued, as part of his request for a departure sentence, that the harm caused to the victims in this case was "far significantly less than any of the others that you actually see on a normal situation" in aggravated indecent-liberties cases because Klavetter did not penetrate the girls, use physical force, or make either girl do anything to him. After hearing this argument, the older daughter addressed the court, describing the trauma Klavetter's actions had caused. She closed by noting that even though Klavetter's attorney had described his conduct as "the most insignificant act," it happened to her and impacted her. The court then addressed both her and her sister, telling them "[t]here is nothing insignificant about what happened to you. There is no normal case. I see a lot of cases, and I have more for many, many, many years. There is no normal case. The degree of harm is not less for you."

Klavetter seizes upon the court's statement that there is "no normal case" and argues that this sentiment shows that the court refused to consider his mitigating evidence about the harm his actions caused. But he removes the court's comment from its context—attempting to provide sympathy to the two girls for what they had endured.

And contrary to Klavetter's assertions on appeal, our review of the record shows that the district court did analyze whether the severity of Klavetter's actions was a substantial and compelling reason to depart from the presumptive life sentence. The court

18

simply determined that this rationale did not warrant a departure in this case—that is, that Klavetter's conduct and the impact it had on his victims did not support a finding that the harm was less severe than in other cases.

During the trial, the district court heard the testimony of both daughters, as well as testimony from Mother and multiple family members. The girls and their mother described the substantial trauma they had endured and the profound impact Klavetter's actions had on their family. When it denied Klavetter's request for a departure, the court pointed to the vulnerabilities of Klavetter's victims and the position of trust that he had taken advantage of in committing his crimes, noting the pain, chaos, and sadness his actions had caused. These findings were supported by the evidence, as well as the older daughter's statement at sentencing, and support the court's determination that the severity of Klavetter's actions was not a substantial or compelling reason to depart from the presumptive sentence. See *Jolly*, 301 Kan. at 325. We do not find this assessment—a matter squarely within the district court's discretion—to be unreasonable.

Turning to Klavetter's criminal history, the district court recognized that Klavetter had "led a good law-abiding life" before committing these offenses. But the court noted that it was "not unusual" for defendants in Jessica's Law cases to have no previous criminal record. The court ultimately ruled that Klavetter's lack of criminal history was not a circumstance that compelled a sentencing departure.

Klavetter argues that the district court's statement that it was "not unusual" for defendants to lack a criminal history showed the court was unwilling, as a matter of course, to consider a defendant's criminal history as a mitigating circumstance in a Jessica's Law case. Our review of the transcript, however, leads us to a different conclusion. The court's statements indicate that although the lack of a criminal history may be a substantial consideration, the court did not find it compelling here—that is, it

19

did not find that Klavetter's absence of a criminal record warranted a sentencing departure in this case. This determination was not an abuse of the court's discretion.

Finally, Klavetter argues that the district court erred when it denied his departure motion without considering the overarching policy goals regarding punishment and sentences discussed in K.S.A. 2020 Supp. 21-6601. That statute instructs that Kansas sentencing statutes

> "shall be liberally construed to the end that persons convicted of crime shall be dealt with in accordance with their individual characteristics, circumstances, needs and potentialities as revealed by case studies; that dangerous offenders shall be correctively treated in custody for long terms as needed; and that other offenders shall be dealt with by probation, suspended sentence, fine or assignment to a community correctional services program whenever such disposition appears practicable and not detrimental to the needs of public safety and the welfare of the offender, or shall be committed for at least a minimum term within the limits provided by law." K.S.A. 2020 Supp. 21-6601.

Klavetter asserts that if the district court had heeded the principles of K.S.A. 2020 Supp. 21-6601, it would have granted his departure motion. We find this argument unpersuasive. K.S.A. 2020 Supp. 21-6601 states general policy aims, while more specific directives are included throughout the Kansas sentencing statutes. The district court implicitly considered the policy goals of K.S.A. 2020 Supp. 21-6601 because the structure of Jessica's Law incorporates those principles.

As we have noted, Jessica's Law presumes a life sentence will be imposed when a defendant commits certain sex offenses involving minors, reflecting a legislative presumption that those who commit such crimes pose a danger to society and should receive a harsh punishment. See *State v. Woodard*, 294 Kan. 717, 722, 280 P.3d 203 (2012) (given sex offenders' higher risk to reoffend, the State has a particularly compelling interest in incarcerating offenders to protect children); *State v. Spencer*, 291

Kan. 796, 809, 823-24, 248 P.3d 256 (2011) (noting legislative intent to punish and incapacitate offenders and that unlike other sentencing statutes, which permit upward and downward departures, a life sentence is a maximum sentence with no place to depart but down). By permitting a court to impose a lesser sentence when mitigating circumstances give rise to substantial and compelling reasons for a departure, the Jessica's Law sentencing framework also recognizes—consistent with K.S.A. 2020 Supp. 21-6601— that a case's unique circumstances may warrant a more lenient sentence.

Thus, the principles of K.S.A. 2020 Supp. 21-6601 are embodied by and incorporated into the Jessica's Law sentencing framework. Other panels of our court have reached this same conclusion. See *State v. McElroy*, No. 122,024, 2021 WL 219583, at *1-2 (Kan. App. 2021) (unpublished opinion), *petition for rev. filed* February 19, 2021; *State v. White*, No. 120,719, 2020 WL 1897338, at *2-3 (Kan. App. 2020) (unpublished opinion), *rev. denied* 312 Kan. 901 (2021); see also *State v. Forrest*, No. 120,604, 2020 WL 5739715, at *3 (Kan. App. 2020) (unpublished opinion) (noting argument but finding district court examined all mitigating factors before denying departure), *rev. denied* 312 Kan. 896 (2021); *State v. Rogers*, No. 120,353, 2020 WL 1313809, at *3-4 (Kan. App.) (unpublished opinion) (declining to address argument for the first time on appeal), *rev. denied* 312 Kan. 900 (2020).

The district court's denial of Klavetter's departure motion was not the result of a failure to apply the sentencing principles included in K.S.A. 2020 Supp. 21-6601 or any other Kansas sentencing statutes. Our review of the record shows that the district court properly considered all the mitigating factors Klavetter presented but concluded that those circumstances did not warrant a sentencing departure. The district court did not abuse its discretion when it denied Klavetter's motion for a downward durational departure.

Affirmed.